UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| T.W. LAQUAY MARINE, LLC, | ) |
|        Plaintiff, | ) No. 21 CV 1221 ) ) Judge Jeffrey I. Cummings |
| v. | ) ) |
| GREAT LAKES DREDGE & DOCK, COMPANY, LLC, | ) ) ) |
|        Defendant. | ) |

**MEMORANDUM OPINION & ORDER**

Plaintiff, T.W. LaQuay Marine, LLC ("LaQuay"), brings claims against Great Lakes Dredge & Dock Company, LLC ("Great Lakes"), arising out of an agreement whereby LaQuay would use Great Lakes' dredging vessels and supporting equipment to perform certain dredging obligations. LaQuay seeks a declaratory judgment and asserts causes of action against Great Lakes for negligent misrepresentation, fraudulent misrepresentation, fraudulent inducement, breach of contract, breach of the warranties of seaworthiness, and negligence. (Dckt. #25).

Great Lakes now moves for summary judgment, (Dckt. #69), on the grounds that LaQuay's claims were settled as part of an agreement reached between Great Lakes and non-party Travelers Casualty and Surety Company of America ("Travelers") in September 2021 (the "Settlement Agreement"). In opposition, LaQuay argues that Travelers never had authority to settle LaQuay's claims against Great Lakes, and, even if it did, that the tort claims it alleges through this lawsuit were not included in the Settlement Agreement.

The questions before this Court are thus: (1) whether Travelers had authority to settle LaQuay's claims against Great Lakes when it entered the Settlement Agreement; and (2) whether LaQuay's claims against Great Lakes, which are at issue in the present matter, were settled by

Travelers by the Settlement Agreement. As explained below, the Court finds the answer to both inquires is yes and Great Lakes' motion for summary judgment, (Dckt. #69), is granted.

I.     BACKGROUND

The facts set forth below, which are undisputed unless otherwise noted, are drawn from the parties' pleadings; Great Lakes' Local Rule 56.1 statement of material facts ("DSOF"), (Dckt. #70), and accompanying exhibits, (Dckt. ##70-1 to 70-5); and LaQuay's Rule 56.1 statement in opposition to DSOF ("DSOF Resp."), (Dckt. #74).[1]

    A.     The Parties

At all times relevant to this dispute, LaQuay was a dredging company operating on the Texas Gulf Coast. (DSOF Resp. ¶6). Great Lakes was also a dredging company, (*id.* ¶2), and the owner of dredge and other related vessels, (*id.* ¶10).

    B.     The Indemnity Agreement

This matter generally relates to a series of agreements. The first agreement—Travelers' General Agreement of Indemnity—was entered into between LaQuay and Travelers in August 2018 (the "Indemnity Agreement"). (*Id.* ¶7; Dckt. #70-1). Relevant here, the Indemnity Agreement contained the following provision:

> **Remedies**: In the event of a Default, Indemnitors, [here, LaQuay], assign, convey and transfer to Company, [here, Travelers], all of their rights, title and interests in Property, and [Travelers] shall have a right in its sole discretion to . . . assert or prosecute any right or claim in the name of [LaQuay] and to settle any such right or claim as [Travelers] sees fit . . .

---

[1] The Court notes that LaQuay filed a Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment, (Dckt. #75), which the Court considers a Local Rule 56.1(b)(3)(C) statement of additional facts. However, because LaQuay's Local Rule 56.1 filing does not cite specific record evidence to support its factual assertions, the Court will disregard them. *See, e.g., Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, 789 F.3d 707, 710 (7th Cir. 2015) ("[T]he district court did not abuse its discretion in disregarding the facts contained in [the plaintiff's] statement of additional facts that were not supported by proper citations to the record.").

(the "Remedies Provision"), (Dckt. #70-1 at 2).

The Indemnity Agreement defines "Default" to include "a declaration of Contract default by any Obligee." (*Id.* at 1). "Obligee" in turn is defined as "[a]ny person or entity in whose favor a Bond has been issued and that person's or entity's successors and assigns." (*Id.*). Property is defined as "[LaQuay's] right, title and interest, whether now held or hereafter acquired in . . . any . . . contract including but not limited to subcontracts." (*Id.*). The Indemnity Agreement further provided:

> [LaQuay] irrevocably constitute, appoint and designate [Travelers] as their attorney in fact with the right, but not the obligation, to exercise all rights of [LaQuay] assigned or granted to [Travelers] and to execute and deliver any other assignments, documents, instruments or agreements deemed necessary by [Travelers] to exercise its rights under th[e Indemnity Agreement] in the name of [LaQuay].

(*Id.* at 2).

### C. The Project and Execution of the Payment Bond

Sometime before or on August 16, 2019, LaQuay contracted with the U.S. Army Corps of Engineers to perform pipeline dredging work in Cameron County, Texas (the "Project"). (DSOF Resp. ¶8). On August 16, 2019, Travelers and LaQuay executed a payment bond to secure LaQuay's obligations to perform under the Project (the "Payment Bond"). (*Id.* ¶11, Dckt. #70-2).

### D. The Executed Charter Between LaQuay and Great Lakes and LaQuay's Subsequent Default

On September 19, 2019, approximately one month after the Payment Bond was executed, LaQuay executed a bareboat charter agreement (the "Charter") with Great Lakes to use Great Lakes' dredging vessels and supporting equipment to perform its obligations for the Project. (DSOF Resp. ¶15, Dckt. #70-3).

3

Just over three months later, on December 23, 2019, Great Lakes sent LaQuay a "Notice of Default" indicating that LaQuay's failure to meet certain payment obligations constituted a "breach and default of the Charter." (DSOF Resp. ¶18, Dckt. #70-4 at 5). Great Lakes sent additional letters both to LaQuay and the U.S. Army Corp of Engineers, and ultimately, in March 2020, filed a formal claim against the Payment Bond with Travelers. (DSOF Resp. ¶¶19–21, Dckt. #70-4 at 11–22). On May 15, 2020, Travelers sent a letter to counsel for Great Lakes acknowledging receipt of Great Lakes' claim under the Payment Bond and indicating that Travelers was investigating both Great Lakes' claim for payment and any possible defenses available to LaQuay relating to the Charter. (DSOF Resp. ¶22, Dckt. #70-5).

### E. Litigation Initiated by LaQuay and Great Lakes

Just a few days later, on May 18, 2020, LaQuay filed a lawsuit against Great Lakes in the the Southern District of Texas. (DSOF Resp. ¶24). A few weeks later, on June 6, 2020, Great Lakes brought a separate action in this Court against LaQuay and Travelers for payments due and owing under the Charter. (*Id.* ¶23). Great Lakes' case was assigned Case No. 20-cv-3350. On March 3, 2021, the Southern District of Texas granted Great Lakes' motion to transfer LaQuay's lawsuit to this District based on the Charter's forum selection clause. (*Id.* ¶34). Laquay's case was then transferred to this District and assigned Case No. 21-cv-1221. (Dckt. #1). On March 25, 2021, the Court consolidated Great Lakes' case with Laquay's lawsuit pending in this District under Case No. 21-cv-1221 (the present case number). (Dckt. ##1, 26; Case No. 20-cv-3350, Dckt. #41).

### F. Great Lakes' Settlement with Travelers

At some point prior to September 20, 2021, Travelers approached Great Lakes to settle Great Lakes' claims against the Payment Bond and against LaQuay. (DSOF Resp. ¶38). The

4

settlement negotiations between Great Lakes and Travelers included the resolution of LaQuay's claims against Great Lakes in the instant matter. (*Id.*). Travelers and Great Lakes ultimately signed the Settlement Agreement on September 20, 2021, pursuant to which Great Lakes' claims against Travelers and LaQuay *and* LaQuay's claims against Great Lakes were compromised, settled, and released. (*Id.* ¶40, Dckt. #70-4 at 30).

Relevant here, the Settlement Agreement further provided:

> Travelers is executing this Agreement as attorney-in-fact for LaQuay per the terms of the Indemnity Agreement . . . Under the terms of the Indemnity Agreement due to [LaQuay's] default under the Indemnity Agreement, [LaQuay has] assigned, conveyed, and transferred to Travelers all of [LaQuay's] rights . . . in any contract . . . Such assignment includes LaQuay's claims asserted against [Great Lakes] . . .

(Dckt. #70-4 at 27–28). The Settlement Agreement also contained a release, whereby

> LaQuay, by and through its attorney-in-fact, Travelers . . . release[d], acquit[ed], and discharge[d Great Lakes] . . . from any and all claims, demands, and causes of action . . . whether in tort or contract . . . that related to the bond or the parties' respective lawsuits.

(Dckt. #70-4 at 30).

Great Lakes then moved for summary judgment, arguing that the claims asserted by LaQuay against it in this lawsuit were settled through the Settlement Agreement.

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence of a factual dispute between the parties will not preclude summary judgment *unless* it is a genuine

5

dispute as to a material fact); *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004) (issues of material fact are material if they are outcome determinative).

When the moving party has met that burden, the non-moving party cannot rely on mere conclusions and allegations to concoct factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cnty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020).

"The proper interpretation of a contract is ordinarily a matter of law, and where there is no contractual ambiguity, there is no resort to extrinsic evidence, hence no factual dispute to preclude summary judgment." *Int'l Union v. ZF Boge Elastmetall LLC*, 649 F.3d 641, 646 (7th Cir. 2011). "When the case turns on the interpretation of contractual documents, the district court should determine the pertinent provisions of the contract . . ." *Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 602 (7th Cir. 1989). Ultimately, summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up).

### III. ANALYSIS

Great Lakes moves for summary judgment on the grounds that Travelers had the authority to settle, and did settle, LaQuay's claims against Great Lakes via the Settlement Agreement. LaQuay opposes Great Lakes' motion and argues that the assignment provision of the Indemnity Agreement was never triggered, such that Travelers never had authority to act as

LaQuay's attorney-in-fact, and further, that even if assignment occurred, Travelers had no authority under the Indemnity Agreement to settle the tort claims LaQuay raises in the present suit.  For the reasons set forth below, the Court agrees with Great Lakes and finds, as a matter of undisputed fact and law, that Travelers properly settled and released LaQuay's claims against Great Lakes as part of the Settlement Agreement.

      A.      **Travelers Had Authority to Settle LaQuay's Claims Against Great Lakes Under the Indemnity Agreement**

Great Lakes first argues that Travelers had authority under the Indemnity Agreement to settle LaQuay's claims against Great Lakes when Travelers executed the Settlement Agreement. The Court agrees.

By entering into the Indemnity Agreement, LaQuay agreed that upon an event of "Default," it would "assign, convey, and transfer" all of its "rights, title and interests" in any contracts to Travelers, and that Travelers would then have the right to settle any such "right or claim" as Travelers saw fit.  (Dckt. #70-1 at 1–2).  The parties agree this assignment provision is valid, however they dispute whether an event of "Default" occurred, thereby triggering assignment to Travelers.

Great Lakes argues that the Indemnity Agreement unambiguously defines "Default" to include "a declaration of Contract default by [Great Lakes]," and that "Default" occurred when it first sent a Notice of Default to LaQuay in December 2019.  (Dckt. #71 at 8–9).  For its part, LaQuay does not deny that Great Lakes declared it in default of the Charter.  Instead, LaQuay argues that the Indemnity Agreement does not "lay out the proper steps" to determine an event of "Default" and therefore gives rise to questions of fact.  (Dckt. #73 at 5).  More specifically, LaQuay argues that the Indemnity Agreement does not contain provisions which require

7

Travelers to identity which theory of "Default" it is invoking or explain the grounds for its determination that "Default" occurred. (Dckt. #73 at 4–5).

Under Illinois and Texas law, the Court's "primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007); *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011) ("In construing a contract, a court must ascertain the true intentions of the parties as expressed in the writing itself.").[2] Where, "there is no ambiguity in the terms of the contract, [the intention of the parties] must be determined from the language of the contract alone." *Flora Bank & Trust v. Czyzewski*, 583 N.E.2d 720, 725 (1991) (cleaned up); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law.").

Here, nothing in the Indemnity Agreement suggests that the assignment of LaQuay's claims was dependent upon whether Travelers first identified and explained which grounds for "Default" were being invoked. And LaQuay fails to point to any binding or persuasive authority which demonstrates that the absence of such provisions renders the Indemnity Agreement ambiguous where the agreement otherwise unequivocally states that "a declaration of Contract default by [Great Lakes]," is an event of "Default." (Dckt. #70-1). Instead, the express terms of the Indemnity Agreement make clear that a "Default" occurred when Great Lakes sent a Notice

---

[2] As a federal court sitting in diversity, this Court applies state substantive law. *Horne v. Electric Eel Manufacturing Company, Inc.*, 987 F.3d 704, 713 (7th Cir. 2021). The Indemnity Agreement does not contain a choice of law provision. The parties cite both Texas law (as the state where the Indemnity Agreement was executed on behalf of a Texas corporation for work to be performed in Texas) and Illinois law (as the forum state). Nonetheless, because both Illinois and Texas law employ the same principles regarding contractual interpretation, the Court can decide the present case without conducting a choice of law analysis since the result reached will be the same regardless of which state's law governs.

of Default to LaQuay in December 2019 and all of LaQuay's claims against Great Lakes were assigned to Travelers on that date. *See*, *e.g.*, *Fucich Contracting, Inc. v. Shread-Kuyrkendall & Assocs., Inc.*, No. CV 18-2885, 2022 WL 16552815, at *30 (E.D.La. Oct. 31, 2022) (holding that "Once the Parish declared FCI to be in default under the Prime Contract for performance of the Project, there existed a 'Default' under the [Indemnity Agreement] and the right to settle the Indemnitors' claims was granted to Travelers . . ."). Thus the Court finds that Travelers had authority under the Indemnity Agreement to settle LaQuay's claims against Great Lakes when Travelers executed the Settlement Agreement.

    **B.  The Court Will Not Read Implied Terms Into the Indemnity Agreement**

LaQuay further argues the Indemnity Agreement should be read to include two implicit prerequisites that had to be met before Travelers could exercise its rights—namely, that (1) Travelers was required to notify LaQuay of its intention to settle LaQuay's claims; and (2) there had to be a judicial determination of default. Both of these contentions fail.

Under Illinois law, contract terms implied in law can, in certain circumstances, supplement express terms. *Bane v. Ferguson*, 707 F.Supp. 988, 993 (N.D.Ill.), *aff'd*, 890 F.2d 11 (7th Cir. 1989) (cleaned up). "There are two broad categories of terms which are implied in contracts under Illinois law: Those incorporating the law at the time and place of the making of the contract, and those reflecting inferred intentions, necessarily implied from the express provisions of the contract." *Id.*

LaQuay does not refer this Court to any Illinois (or Texas) law in effect at the time the Indemnity Agreement was executed that supports its arguments. Any implied promise thus would have to be the result of an inferred intention, or a promise necessary to the performance of the Indemnity Agreement. But, LaQuay does not point to, and this Court's own research does

9

not show, that Illinois (or Texas) courts have held that a promise to preemptively notify an indemnitor of the proposed resolution of its assigned claims, or a promise to obtain a judicial determination of default, are necessary to the performance of an indemnity agreement. *See Bane*, 707 F.Supp. at 993 (declining to supplement an agreement with an implied obligation requiring the law firms' partners to manage the firm so as to provide retirement benefits to Bane, a retired partner of the firm, or his spouse). Nor has LaQuay put forth any evidence on which such an intention to include these promises in the Indemnity Agreement can be inferred. In fact, to the contrary, when a contract is clear and unambiguous, like the Indemnity Agreement, "a court will not add terms in order to reach a result more equitable to one of the parties." *Mid-W. Energy Consultants, Inc. v. Covenant Home, Inc.*, 815 N.E.2d 911 (2004) (cleaned up); *see also Daniel v. Morris*, No. 01-22-00319-CV, 2024 WL 748081, at *6 (Tex.App. Feb. 22, 2024) (explaining the court could not add terms to the parties' agreement to require a party seeking entry of a judgment on an agreement do so under seal). Accordingly, the Court finds LaQuay's argument does not raise an issue of fact sufficient to defeat summary judgment.

### C. LaQuay's Claims Against Great Lakes Were Settled Through the Settlement Agreement

Next, Great Lakes argues that Travelers actually settled LaQuay's pending tort claims against Great Lakes when Travelers executed the Settlement Agreement. The Court agrees. The Settlement Agreement specifically contained a release, whereby

> LaQuay, by and through its attorney-in-fact, Travelers . . . release[d], acquit[ed], and discharge[d Great Lakes] . . . from any and all claims, demands, and causes of action . . . whether in tort or contract . . . that related [to the bond or the parties' respective lawsuits].

(Dckt. #70-4 at 30).

10

LaQuay does not dispute the language of the Settlement Agreement, but nevertheless argues that Travelers still could not settle LaQuay's commercial tort claims because the Indemnity Agreement did not comply with certain provisions of the Uniform Commercial Code ("UCC"). (Dckt. #73 at 7–8). Relevant here, the Indemnity Agreement contained the following provision:

> **Security Interest:** This Agreement shall for all purposes constitute a Security Agreement for the benefit of [Travelers] in accordance with the Uniform Commercial Code ("UCC") and all similar statutes . . .

(Dckt. #70-1 at 2). Both Illinois and Texas' respective UCCs allow for the creation of security interest in personal property, 810 ILCS 5/9-101 *et seq.*; Tex. Bus. Corp. Act Ann. §9.101 *et seq.*, and LaQuay argues that the Indemnity Agreement did not meet the UCCs' requirements such that Travelers' security interest attached to LaQuay's commercial tort claims.

Nonetheless, even presuming that LaQuay is correct, all LaQuay has demonstrated is that Travelers did not have a security interest that attached to its tort claims against Great Lakes. LaQuay suggests that the "Security Interest" provision is the only method for assigning or conveying its claims under the Indemnity Agreement. But accepting LaQuay's interpretation would render other provisions of the Indemnity Agreement null in contravention of established contractual interpretation principles. *Land of Lincoln Goodwill Indus., Inc. v. PNC Fin. Servs. Grp., Inc.*, 762 F.3d 673, 679 (7th Cir. 2014) (explaining courts seek to "give meaning to every provision of the contract" and "avoid a construction that would render a provision superfluous."); *see also Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) ("A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used."); *MIECO, LLC v. Pioneer Natural Resources USA, Inc.*, 109 F.4th 710, 717–19 (5th Cir. 2024) (explaining that

11

courts should not interpret a contract in a way that renders any portion meaningless or superfluous); *Ewing Constr. Co., Inc. v. Amerisure Ins.*, 420 S.W.3d 30, 37 (Tex. 2014) ("[I]nterpretations of contracts as a whole are favored so that none of the language in them is rendered surplusage.").

As this Court determined above in Section III(A), LaQuay's tort claims could be—and were—assigned to Travelers under the Remedies Provision when Great Lakes declared LaQuay in "Default" of the Charter. None of the cases cited by LaQuay support the proposition that failure to create a security interest under an Indemnity Agreement renders any other assignment provisions contained in the agreement void. LaQuay's UCC arguments therefore fail to raise an issue of material fact sufficient to defeat summary judgment.[3]

### D. Travelers' Post-Settlement Statements Do Not Raise an Issue of Material Fact

In a final attempt to raise a genuine issue of fact, LaQuay submits a declaration from Foglietta Silverstein, Travelers' Managing Director and Counsel, dated January 2024, in which Silverstein states that "Travelers *currently* has no rights regarding the tort claim[s] asserted by LaQuay" through the instant lawsuit, and if LaQuay receives an award in this case, "Travelers has waived its right to that recovery." (Dckt. #75-1 at 2) (emphasis added). Contrary to LaQuay's assertions, this statement does not "generate[] a fact issue" as to whether Travelers *ever* had authority to unilaterally settle LaQuay's tort claims. (Dckt. ##73 at 11). Specifically, Silverstein does not aver that Travelers lacked authority under the Indemnity Agreement to settle

---

[3] LaQuay additionally argues that Travelers did not have the right to settle LaQuay's commercial tort claims because the "Claim Settlement" provision of the Indemnity Agreement only references "any claim, demand or suit brought against Travelers or LaQuay in connection with or relating to any Bond . . .," (Dckt. 70-1 at 1), and not claims brought *by* LaQuay. This argument again ignores other provisions of the Indemnity Agreement, namely the Remedies Provision, and therefore fails for the same reasons set forth in this section.

12

LaQuay's claims against Great Lakes when it settled them, nor does she aver that LaQuay's claims against Great Lakes were excluded from the Settlement Agreement executed by Travelers and Great Lakes in September 2021.

To the contrary, the Settlement Agreement, which was signed by Silverstein herself, provided:

> Travelers is executing this Agreement as attorney-in-fact for LaQuay per the terms of the Indemnity Agreement . . . Under the terms of the Indemnity Agreement due to [LaQuay's] default under the Indemnity Agreement, [LaQuay has] assigned, conveyed, and transferred to Travelers all of [LaQuay's] rights . . . in any contract . . . Such assignment includes LaQuay's claims asserted against [Great Lakes] . . .

(Dckt. #70-4 at 27–28).

Accordingly the Court finds that Silverstein's declaration does not give rise to a genuine issue of fact sufficient to defeat Great Lakes' motion for summary judgment. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735–36 (7th Cir. 2002) (non-movant's affidavit, which said that she did "not *recall* seeing or reviewing the . . . brochure" about an arbitration program, was insufficient to raise a genuine issue of fact when the defendants presented evidence that the brochure was "definitely" sent.).

## CONCLUSION

For the reasons stated above, defendant Great Lakes Dredge & Dock Company LLC's motion, (Dckt. #69), is granted.

**Date: May 20, 2025**

_____
**Jeffrey I. Cummings
United States District Court Judge**